IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01487-KLM

LAUREN A. VALDEZ,
on behalf of L.M., a minor child,

        Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security,

        Defendant.
_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

        This matter is before the Court[1] on review of the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income Benefits ("SSI") childhood disability payments for her then four-year-old son under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383 ["the Act"].  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).

        The Court has reviewed Plaintiff's Opening Brief [#16][2]; Defendant's Response Brief [#21] ("Response"), Plaintiff's Rely Brief [22] ("Reply"), the Social Security Administrative Record [#14] ("AR"), and the applicable law and is sufficiently advised in the premises.  For

_____

[1] The parties consented to proceed before the undersigned pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.  *See* [#15].

[2] "[#16]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

the reasons set forth below, the decision of the Commissioner is **REVERSED** and **REMANDED** for further fact finding.

## I.  The Applicable Sequential Evaluation

The sequential evaluation process that applies for disability claims as to a child requires the ALJ to determine: (1) whether the child is engaged in substantial gainful activity, (2) whether the child has an impairment or combination of impairments that is severe, and (3) whether the child's impairment meets or equals an impairment in Appendix 1, Subpart P of 20 C.F.R. Pt. 404 (the Listings).  20 C.F.R. §416.924(a); *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1237 (10th Cir. 2001).  If the child does not meet or medically equal the requirements of a listing, it must  be determined whether the child functionally equals a listing.  20 C.F.R.   §416.926a(a). In order to functionally equal a listing, the impairment must result in marked limitations in two of the six domains, or an extreme limitation in one domain. *Id*.; *Briggs*, 248 F.3d at 1237-38.  The six domains which are considered are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

A child has a marked limitation when the impairment or combination of impairments interferes seriously with the child's ability to independently initiate, sustain or complete activities.  20 C.F.R. § 416.926(e)(2)(I).   A child has an extreme limitation when the impairment or combination of impairments interferes very seriously with the child's ability to independently initiate, sustain or complete activities.  20 C.F.R. § 416.926(e)(3)(i).  A

marked limitation is the equivalent of functioning expected on standardized testing with scores that are at least two standard deviations below the mean, while an extreme limitation is three standard deviations or more below the mean.   20 C.F.R. § 416.926a(e)(2)(I) &(e)(3)(i).

## II.  The ALJ's Findings

On November 9, 2015, Plaintiff applied for child's SSI on behalf of her then four-year-old son, L.M.  AR 15, 252-60.  L.M. was born on November 29, 2010, was nine-years old at the time of the hearing, and is in special education.  *Id*. 18-20.  After early administrative denials, the ALJ held hearings and issued a June 2019 decision finding that L.M. was not disabled.  *Id*. 15-30, 37-82, 84-101.

The ALJ found at step one of the sequential evaluation that L.M. had not engaged in substantial gainful activity, that he was a preschooler on November 9, 2016 (the date the application was filed) and that he was a school-age child.  AR 18.  At step two, the ALJ found that L.M. had severe impairments of autism, neurodevelopmental disorder, sensory processing disorder, and mixed receptive expressive language disorder.  *Id*.  At step three, the ALJ found that L.M.'s impairments did not meet, medically equal, or functionally equal the severity of any of the listed impairments.  *Id*. 18-19.  The ALJ stated on that issue that in evaluating the four broad areas of mental functioning for evaluating mental dysfunctions in the Childhood Listing of Impairments, the ALJ found that L.M. only had a moderate limitation in adapting or managing himself, and mild to no limitations in the other areas.  *Id*.

The ALJ thus went on to determine whether L.M.'s impairments or combination of impairments functionally equaled the severity of any listed impairments, and found that they did not.  *Id*. 19-24.  The ALJ found as to the six relevant domains that L.M. had a less than

marked limitation in (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, and (4) the ability to care for himself.  *Id*. at 19-27, 28-29.  The ALJ found that L.M. had no limitation in (5) moving about and manipulating objects, and (6) health and physical well-being.  *Id*. 27-30.  As a result, the ALJ concluded that L.M. was not disabled within the meaning of the Act.  *Id*. at 20, 30.

In making these findings, the ALJ stated that he gave "great weight" to the opinions of medical expert Kristy Farnsworth, stage agency psychologist James Wanstrath, Ph.D., and medical consultant Pamela  McKenzie M.D., with "slightly greater weight going to Dr. Farnsworth's more recent opinion concerning attending and completing tasks than to those of the state agency doctors."  *Id.* at 25.  None of these providers examined L.M.  The ALJ gave "lesser weight" to the opinions of L.M.'s teachers and other school professionals.   The opinions of the nonexamining medical providers and the evidence from the school professionals are discussed in Sections IV and V.

The Appeals Council denied review (AR 1-6), and the ALJ's decision became final for purposes of judicial review. See 20 C.F.R. §§ 416.1481, 422.210(a) (2019).  This appeal followed.

### III.  Standard of Review

Under the applicable legal standard, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); *see also Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009).  "When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined

effects of the impairments in making a disability determination." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).

The Court reviews a final decision by the Commissioner by examining the administrative record and determining "whether the [ALJ's] factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "Evidence is not substantial if it is overwhelmed by other evidence or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). In other words, the Court's determination of whether the ALJ has supported his or her ruling with substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). In addition, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

A court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. However, it "may not reweigh the evidence nor substitute [its] judgment" for the Commissioner's. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

## IV.  The Opinion and Lay Evidence

The opinions of the nonexamining medical providers as to L.M.'s level of functional impairments regarding the six domains are compared below with the May 2, 2019 opinion

of school psychologist Marv Johnson.

| Domain | Marv Johnson | Dr. Farnsworth | Dr. McKenzie/ Dr. Wanstrath |
|---|---|---|---|
| Acquire/use information | Less than Marked | Less than Marked | Less than Marked |
| Attend to Tasks | Marked | Less than Marked | No limitation |
| Interact with Others | Extreme | Less than Marked | Less than Marked |
| Move/Manipulate Objects | No limitation | No limitation | No limitation |
| Care for Self | Marked | Less than Marked | Less than Marked |
| Health/Wellbeing | Extreme | No limitation | No limitation |

Tr. 73-74, 115-116.

The school counselor, Jason Wilson ("Wilson"), testified to events he witnessed regarding L.M.. Tr. 315. Wilson described "intense episodes" lasting for as long as three to four hours. *Id*. He also described events where L.M. ran around both inside and outside the school building, refused to come in after recess, hid in the playground, lifted a table and slid it across the room, threw chairs and desks, and tore apart his classroom. *Id*. In addition, Wilson discussed times when L.M. became physically aggressive, hitting, kicking, biting, scratching, and wrestling. *Id*. L.M. was said to yell, scream, call adults derogatory names, and be stubborn and defiant. *Id*. Further, L.M. was not able to regulate his self-control without "intensive intervention strategies." *Id*.

Amber Carleo ("Carleo"), the child's second grade teacher, completed the Commissioner's standard form "Teacher Questionnaire." Tr. 1088-1091. She confirmed that she had known L.M. for nine months and had seen him seven hours a day four days a week. *Id*. Carleo found that L.M. had obvious, serious and very serious problems In the domains of Acquiring and Using Information, Caring for Himself, and Attending and Completing Tasks, *id*, as discussed below in Section V.

-6-

Kelsi Vigil ("Vigil"), L.M.'s special education teacher, also completed the Teacher Questionnaire form.  Tr. 319-24.  She stated that she had known L.M. for two years and had seen him one hour a day.  *Id*.  Like Carleo, Vigil found that L.M. had obvious, serious and very serious  problems in the domains of  Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Onself, which are described in Section V.C, *infra*.

L.M.'s mother testified that L.M. does not like to take showers because he is afraid of the shower head.  Tr. 54.  L.M. had a hard time if the gym is loud, and his jujitsu coach gave him one-to-one time, "but that didn't stop him from having melt downs."  *Id*.  L.M. gets overwhelmed at recess, hits people, has to be pulled off the playground, and has trouble getting along with peers.  *Id*. 60, 64.

## V.  Analysis

Plaintiff argues that the ALJ did not have valid reasons for assigning less weight to the school professionals than he assigned to the opinions of the three nonexamining providers.  *Opening Brief* [#16] at 15-29.   The Court now turns to those arguments.

### A.    The Weighing Process

The regulations provide that in assessing the child's functioning in each domain relevant to whether the child's impairments are functionally equivalent to a listing, the Commissioner will seek information from medical sources, and non-medical sources such as  teachers, parents, and others who can describe the child's functioning at home, in school, and in the community.  20 C.F.R. §416.926a(b)(3); Social Security Ruling 09-2p, 2009 WL 396032 at *4.  As to medical sources, the Commissioner states, and the Court agrees, that the agency's older rules for evaluating medical opinions apply.  *See Response*

[#21] at 1 n. 1.  This is because the SSI application was filed before March 27, 2017, when the new rules took effect.  See 20 C.F.R. § 416.920c (2017).

Under the older rules, an ALJ must consider all the medical opinions in the record and discuss the weight each opinion is assigned.  *Mays v. Colvin,* 739 F.3d 569, 578 (10th Cir. 2014).  "[W]hen deciding what weight to assign to an opinion, an ALJ must consider the factors set forth at 20 C.F.R. §§ 404.1527(d) and 416.927(d)."  *Lauxman  v. Astrue*, 321 F. App'x 766, 769 (10th Cir. 2009).[3]  "The opinion of an examining physician or psychologist is generally entitled to less weight than that of a treating physician or psychologist, and the opinion of an agency physician or psychologist who has never seen the claimant is generally entitled to the least weight of all."  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  It appears that the ALJ may have applied the new rules, since he weighed the persuasiveness of the medical sources' opinions using the supportability and consistency factors outlined in the new regulations, 20 C.F.R. §§ 404.1520c(c) and 416.920c(c)).   As to nonmedical opinions, the ALJ should consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence,

---

[3]  The regulatory factors are: "'(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.'"  *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (citations omitted).

and any factors which tend to support or contradict the opinion.  SSR 06-03P, 2006 WL 2329939, at *5.

As noted previously, the ALJ gave "great weight" to the opinions of Drs. Farnsworth, James Wanstrath, and McKenzie M.D., with "slightly greater weight going to Dr. Farnsworth's more recent opinion."  Tr. at 25.  Thus, the ALJ adopted the nonexamining physicians' opinions with respect to five of the domains, but with the more restrictive finding of a less than marked impairment in the ability to complete tasks opined to by Dr. Farnsworth.  The ALJ gave "lesser weight" to the opinions of L.M.'s teachers and school professionals, although he did not give an explanation of what, if any, weight he gave these opinions.  *Id*.  The Court finds errors in connection with the way the evidence was weighed. First, it appears that the ALJ applied the wrong test as he applied the new rules. even though Plaintiff's application was filed before the new rules took effect.

Second, the ALJ gave great weight to the nonexamining physicians as they "are acceptable medical sources, and are trained to make exacting observations regarding functional capacity."  Tr. 24.  In contrast, the ALJ found that while the educational professionals "spent time observing the claimant in a classroom setting," their "observations may be less reliable overall than that of medically trained doctors and psychologists."  *Id.*. From the foregoing, it appears that the ALJ found that observations made by educational professionals generally are less reliable than observations made by physicians.  There is no evidence suggesting that the observations of the educational professionals in this case are unreliable, and the ALJ failed to consider the appropriate factors discussed in SSR 06-03P, 2006 WL 2329939, at *5.  Further, the ALJ ignored the fact that Marv Johnson is a psychologist who would also have training in making "exacting observations regarding

functional capacity." *Id.*

Finally on this issue, the regulations make clear that opinions from non-medical sources may outweigh the opinion of a medical source if the non-medical source has seen the individual more often, has greater knowledge of the individual's functioning over time, or if the non-medical source's opinion has better supporting evidence and is more consistent with the evidence as a whole." 20 C.F.R. § 416.927(f)(1); *see also Charisma Lee R. on Behalf of J.R.N.R v. Comm'r Soc. Sec.*, No. 19-CV-1092Sr, 2021 WL 1226461, at *3 (W.D.N.Y. March 31, 2021) (citing cases). "Given their close interaction with students on a regular basis, teachers are considered valuable sources of evidence for assessing the severity of a child's impairment and its effect on the child's ability to function." *Zoe R. v. Comm'r Soc. Sec.,* No. 20-CV-1022SR. 2021 WL 3270505, at *3 (W.D.N.Y. July 30, 2021) (citing SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). The ALJ erred in failing to acknowledge the foregoing.

### B.    Consistency Factor

As stated previously, in giving great weight to the opinions of the nonexamining physicians and psychologist, the ALJ relied on the consistency and supportability factors. In the older rules, these factors were expressed as "the degree to which the physician's opinion is supported by relevant evidence" and the "consistency between the opinion and the record as a whole." *See Watkins*, 350 F.3d at 1301; 20 C.F.R. §§ 404.1520c(c) and 416.920c(c)). The Court first addresses the consistency factor.

In giving great weight to the opinions of the nonexamining physicians, the ALJ stated that "they are all generally consistent with each other. . . ." Tr. 23. The Court agrees with Plaintiff that consistency alone between the medical providers is not sufficient to give greater

weight to the medical providers' opinions, particularly in this case where none of the providers actually saw or examined L.M.   Moreover, the ALJ was not entitled to give the opinions of the school professionals lesser weight simply because they were inconsistent with the medical providers.  *See id*. at 25 (stating that the school professionals' opinions "are inconsistent" with the opinions of the medical providers).  Regardless of his preference for the medical providers' opinions, the ALJ had to properly weigh all the evidence and resolve the conflict between the testimony of the medical providers and the school professionals.  *See Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Lopez v. Astrue*, 642 F. App'x 826, 832 (10th Cir. 2016); *Richardson v. Astrue*, 858 F. Supp. 2d 1162, 1170 (D. Colo. 2012).

The ALJ also appeared to give little weight to the opinions of the school professionals because he found that they conflicted with each other. The ALJ did not explain this finding, and the fact that there are, at best, minor differences between the opinions of the educational professional's opinions does not mean all four opinions should be entirely discounted.  The ALJ did not explain why the differences equally discredited all four opinions and, in fact, each opinion had to be considered independently.  Moreover, the opinions cannot be expected to be entirely consistent because the school professionals all have differing viewpoints from their observations of, and interactions with, L.M.  *Id*.  Nonetheless, the Court finds that the opinions were actually remarkably consistent in finding that L.M. had at least serious problems in many of the domains, as discussed further in Section V.C, *infra*.  And the teachers' opinions were generally consistent with the opinions of the school psychologist and counselor.  To the extent the ALJ gave less weight to the opinions of the school professionals on this basis, the ALJ erred.

### C.      Supportability Factor

The ALJ also gave great weight to the opinions of the nonexamining medical providers because he found that "the evidence generally supports" their opinions.  Tr. 24. The ALJ discussed what evidence he relied on to support that decision in the last paragraph of page 23 and the beginning of page 24 of the Administrative Record.  The ALJ found as to the opinions of the school professionals that they "are inconsistent with [the] factors" the ALJ discussed, and were "inconsistent with the well supported opinions" of the medical providers.  *Id.* at 24.  The Court finds that the ALJ's findings that he relied on to give greater weight to the medical providers were not supported by substantial evidence, as discussed in connection with the relevant domains below.

### A..     Acquiring and Using Information and Attending and Completing Tasks

The Court discusses these two domains together because the ALJ relied on the same evidence to find that L.M. had less than marked limitations in these two domains.  The ALJ stated as to these domains that L.M.'s grades were not failing, he was never held back a grade, and he could read and do math near grade level.  Tr. 24.  The ALJ further stated that this "suggests some degree of academic success and does not suggest a marked limitation in acquiring and using information or attending and completing tasks despite his symptoms." *Id*.  The Court agrees with Plaintiff that the ALJ is improperly conflating or confusing the two domains.   *See Opening Br.* [#16] at 21.

All the sources found L.M. to be less than marked limited in the domain of acquiring and using Information.  That domain addresses learning and involves academic skills in such areas as reading, writing, and math.  §416.926a(g)(2)(iv).; *see also* Tr. 24 (the ALJ noted that without an impairment in this domain a school-age child "should be able to learn

to read, write, and do math. . . ."). L.M.'s academic success demonstrates that he is not markedly limited in the ability to acquire and use information, and that issue is not before the Court. However, that does not translate into a finding that L.M. is not markedly limited in the domain of attending and completing tasks, which considers "how well [the child is] able to focus and maintain [his] attention, how well [he can] begin, carry through, and finish [his] activities." 20 C.F.R. § 416.926a(h); *see also* Tr. 25-26 (ALJ's decision).

Contrary to the ALJ's finding that the school professionals' opinions "conflict with each other" (Tr. 24), the opinions of teachers Carleo and Vigil are remarkably consistent in finding serious and obvious problems in the domain of attending and completing tasks. Both opined that L.M. had a serious problem completing class and homework assignments, working without distracting himself and others, and working at a reasonable pace and finishing on time. AR 321; 1090. They also both stated that L.M. had an obvious problem paying attention when spoken to directly and refocusing to task when necessary. *Id*. Both teachers further found that L.M. had problems changing from one activity to another without being disruptive and focusing long enough to finish assigned activity or task; Vigil rates these as serious and Carleo rated them as obvious. *Id*. Consistent with the teachers' evaluations, Marv Johnson, the school psychologist, found that L.M. had a marked limitation in the domain of attending to tasks. The ALJ's finding that L.M. had academic success is not a legitimate ground to support a finding of a less than marked limitation in the domain of attending and completing tasks. Similarly, the ALJ's decision to give the school professionals less weight on this issue because their opinions conflicted is not supported

by substantial evidence.[4]

## B.    Interacting and Relating with Others

The Court now turns to the domain of interacting and relating with others.  The ALJ

concluded that L.M. was limited, but not markedly limited, in this domain because "[a]lthough

he has some problems interacting with peers, his mother admitted he did not have problems

interacting with most adults[,[" "quieter peers such as his sisters[,]" and he played football

and T-ball.  Tr. 23.  The Court also finds that this is not supported by substantial evidence,

as the ALJ selectively applied the evidence on this issue.

As to the ALJ's reliance on the statement of L.M.'s mother that L.M. did not have

problems dealing with adults (AR 23), the ALJ did not consider the rest of what L.M.'s

mother said.  She clarified that L.M. seems to do okay with adults who are patient, kind, and

polite "unless they have a [stern] voice."  *Id*. 64.  Further, there is substantial evidence in the

record that L.M. does not interact appropriately with adults, especially in the school setting.

For example, Wilson described L.M. as yelling, screaming, calling adults derogatory names,

and being stubborn and defiant.  *Id*. 315.  The school's Functional Behavioral Assessment

indicates that L.M. becomes aggressive towards both peers and adults, and "[h]e has made

attempts to intentionally inflict pain and or injure staff that have been forced to intervene with

---

[4] The Commissioner also argues that Dr. Farnsworth considered Mr. Johnson's marked and extreme ratings, but noted that they far exceeded the levels of limitation identified by Ms. Carleo and described by treatment providers. *Response* [#21] at 7 (citing Tr. 76.).  First, the Court does not agree that they "far exceeded" the levels of limitation identified by the teachers.  The teachers observed serious problems in many areas, as discussed in this section and the remaining portion of Section V, and the Commissioner fails to explain how they were inconsistent with psychologist Johnson's opinion, let alone how they "far exceeded" that opinion.  Further, the fact that the teachers "only noted a few serious or very serious problems[,]" in their reports, *id*. at 14, does not provide a basis to simply reject or discount their opinions.  The teachers found serious or very serious problems in four of the domains, and each domain had to be assessed separately.

him." *Id*. 1033.[5]   Moreover, the manner in which L.M. interacted with adults does not provide a basis to give little weight or fail to consider the substantial evidence that L.M. had serious and obvious problems in interacting and relating appropriately with his peers in the educational setting, as noted by the school professionals.  The Tenth Circuit has made clear that while "the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is significantly probative."  *Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

On that issue, school psychologist Marv Johnson opined that L.M. had extreme limitation in this domain.  AR 315.  Consistent with this, Carleo stated that L.M. had a very serious problem expressing anger appropriately and a serious problem playing cooperatively with others.  *Id*. 1091.  She also stated that L.M. had an obvious problem seeking attention appropriately, and an obvious problem making and keeping friends, asking permission appropriately, and following rules.  *Id*.   Similarly, Vigil stated that L.M. had a very serious problem expressing anger appropriately and a serious problem playing cooperatively with others, seeking attention appropriately, and respecting/ obeying adults in authority.  *Id*. 322. Further, Vigil stated that L.M. had an obvious problem making and keeping friends, asking permission appropriately, following rules, using language appropriate to the situation and listener, conversational skills, interpreting meaning of facial expressions and other social cues, and using adequate vocabulary and grammar to express thoughts and ideas.  *Id*.

_____

[5] Similarly, as to the ALJ's reliance on the fact that L.M. participated in sports, the ALJ did not consider the evidence that L.M. struggled in sports due to his impairments.  For example, the record shows that L.M. did well in T-ball when his sister was on the team and could talk for him, but he did not want to continue with baseball "because of the social stuff."  AR 56-57.  Further, L.M. was on a flag football team but had to change teams in mis-season because the kids made fun of him.  *Id*. 58.

Again, the Court finds that these opinions to be consistent, or at least not obviously inconsistent as the ALJ found.  *See id*. 24.

The ALJ also stated as to the domain of interacting and relating with others that "[w]hile the school records suggest that while there was a flare of worsening in terms of his behavior and aggression[,]" that has recently dissipated.  The ALJ concluded as to this domain that "[t]his certainly suggests some ongoing limitation in interacting with others, but not of a marked nature."  *Id.*  The Commissioner expands on this issue, stating that L.M."only did somewhat worse for a short period at the beginning of the 2018-2019 school year" when L.M. was off his medication and not in treatment. *Resp.* [#21] at 1, 10, 12.  The Commissioner further asserts, "[i]n the 2018-2019 school year, the incidents became somewhat more aggressive, but the major episodes had dissipated by early 2019."  *Id.* at 5 (citing AR 1033).

The Court finds that both the ALJ and Commissioner inappropriately downplay the significance of L.M.'s behavioral incidents, whether or not he was in treatment or on medication.  The Commissioner relies on a Functional Behavior Assessment and Intervention Plan ("FBA"), which notes "significant behavioral problems" since L.M. began school in the fall of 2017, "involving both running from the classroom and aggressive behavior towards both peers and adults."  AR 1033.  The FBA further states that during the first semester of 2018-19, "instances of aggression occurred much more often and appeared to be less of an escape issue and turned more towards unleashing his frustration upon others."  *Id*.  While the FBA said that the "[m]ajor aggressive episodes have very recently dissipated[,]" it did not say that the aggression and troubling behaviors had resolved.  Instead, it went on to discuss the "significantly concerning behaviors" involving "physically

aggressive behaviors[,]" and assessed a plan that strategies to address the behavior, including a Crisis Intervention Plan. *Id*. at 1033-34.   The ALJ may not "'pick and choose' from the evidence, using portions of evidence favorable to his position while ignoring other evidence.'" *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008).[6]

The Commissioner also asserts as support for the ALJ's decision that school psychologist Wilson stated in describing significant "emotive reactions" and aggressive behavior that L.M. had recently been able to regulate self-control when directed. *Response* [#21] at 6 (citing AR 315).   Aside from the fact that the ALJ did not rely on this evidence and it is an improper post hoc rationale, *Carpenter*, 537 F.3d at 1267, the evidence was again selectively applied.   Wilson noted immediately prior to the statement described by the Commissioner that the "intense episodes had lasted for as long as three to four hours[,]" and that L.M.'s "only means of calming down [we]re when parents remove him from school."  AR 315.  Wilson then explained that "[u]ntil recently, with the help of intensive strategies . . . he [h]asn't been able to self-regulate when directed by staff."  *Id*.  This again does not mean, however, that the behavioral episodes had stopped, only that L.M. was beginning to be able to self-regulate instead of having to go home with his parents.  Instead, Wilson made clear that L.M. was not able to regulate his self-control without "intensive intervention strategies." *Id*.

---

[6]  The ALJ also improperly attempted to support his improvement theory by relying on the mother's "speculative explanation" that the improvement "was likely due to having a teacher who more readily recognized warning signs and was able to quell them." AR 23.  However, lay speculation has no place in assessing the credibility of medical or nonmedical opinions.  See *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002).

C.    **Caring for Himself**

In the domain of Caring for Himself, both teachers found L.M. to have a very serious problem handling frustration appropriately and using good judgment regarding personal safety and dangerous circumstances.  AR 324; 1093.  Carleo stated that the child had a very serious problem identifying and appropriately asserting emotional needs, while Vigil rated that as a serious problem.  *Id*.  Vigil also stated that L.M. had a serious problem being patient when necessary, responding appropriately to changes in his own mood, using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help, while Carleo stated L.M. had obvious problems in those areas.  The difference is merely one of degree in some realms, and does not justify the ALJ finding that they are so different that they contradict one another. And, importantly, the teacher's responses do not contradict school psychologist Johnson's opinion that L.M. is markedly impaired in that domain; instead, they lend support to his opinion.

In finding that L.M. has less than marked limitation in the ability to care for himself, the ALJ relied on the testimony of L.M. could physically do such things as dress himself, take a bath, do chores of taking out the trash, feed himself and play sports.  AR 24.  The ALJ stated that "does not suggest a marked limitation in the area of caring for himself."  *Id*.  However, the ALJ failed to address the opinions of the school professionals that addressed L.M.'s emotional state, even though the ALJ himself acknowledged later in his decision that the Caring for Yourself domain includes "how a child "maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways."  Tr. 28.  "This includes how the child copes with stress and

changes in the environment. . . ."  Importantly, to be functional in this domain:

> The child should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. The child should also begin to demonstrate consistent control over his behavior, and be able to avoid behaviors that are unsafe or otherwise not good for him.

*Id*. 29.  The ALJ erred in discounting and not properly considering the probative evidence on this point.

## V.  Conclusion

For the reasons set forth above, the Court finds that the ALJ's findings are not supported by substantial evidence and he failed to apply the proper tests in connection with weighing the evidence.  The school psychologist's opinion, which was supported by the opinions of the other school professionals, found that L.M. had a marked limitations in two of the domains and extreme limitation in two other domains.  This evidence had to be properly weighed, as it supports a finding of disability.  Accordingly,

IT IS HEREBY **ORDERED** that this case is **REVERSED AND REMANDED** to the Commissioner for further proceedings consistent with this Order pursuant to sentence four in 42 U.S.C. § 405(g).

IT IS FURTHER **ORDERED** that Plaintiff is **AWARDED** her costs, to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1), D.C.COLO.LCivR 54.1, and 28 U.S.C. § 2412(a)(1).  *See Knuutila v. Colvin*, 127 F. Supp. 3d 1146, 1153 (D. Colo. 2015).

IT IS FURTHER **ORDERED** that the Clerk of Court shall **enter** judgment in favor of Plaintiff and **close** this case.

Dated:  September 24, 2021

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge